**In re DOW CORNING CORPORATION, Debtor.**

**Bankruptcy No. 95–20512.**

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

July 23, 1999.

Barbara J. Houser, Sheinfeld, Maley & Kay, P.C., Dallas, TX, David M. Bernick, Kirkland & Ellis, Chicago, IL, for debtor.

Kenneth H. Eckstein, Kramer Levin Naftalis & Frankel LLP, New York City, for Official Committee of Tort Claimants.

Geoffrey White, White & Meany, Reno, NV, for Certain Nevada Claimants.

### OPINION ON ADMISSIBILITY OF EXPERT TESTIMONY OF CURTIS A. ORGILL.

ARTHUR J. SPECTOR, Chief Judge.

Counsel representing certain Nevada Claimants (the "Nevada Claimants") proffered the expert testimony of Curtis A. Orgill in support of one of their objections to the confirmation of the joint plan of reorganization (the "Joint Plan") proposed by the Debtor and the Official Committee of Tort Claimants (the "Proponents"). For the reasons stated below, the Proponents' objection to the introduction of Mr. Orgill's opinions is SUSTAINED.

### I. Introduction

The Proponents filed the Joint Plan on November 9, 1998. The confirmation hearing commenced June 28, 1999 and is still continuing.

Under the Joint Plan, breast implant claimants would have the option to either

settle or litigate their claims. Claimants who choose to settle would be channeled to the Settlement Facility. Once in the Settlement Facility, claimants would have the opportunity to qualify for a number of different settlement levels. Settlement levels would range from an expedited payment of $2,000 to a $300,000 payment for the most serious injuries.[1] It goes without saying that as the level of settlement offer increases, so does the degree of proof that would be required from a claimant if she is to qualify at that level.

Those claimants who opt to litigate would have their claims channeled to the Litigation Facility (the "Opt-in Claimants"). The Joint Plan proposes to cap funding of the Litigation Facility at $400 million. The Nevada Claimants assert that this aspect of the Joint Plan is illegal, in part, because $400 million would not be enough to pay all Opt-in Claimants in full, leaving allowed claimholders with the prospect of *pro ration*. They further state that as the Debtor's estate is solvent, their claims would be paid in full in a chapter 7 proceeding. Accordingly, they argue, the plan violates § 1129(a)(7)'s best-interests-of-creditors test and cannot be confirmed. In support of this objection, the Nevada Claimants proffered the expert testimony of Curtis A. Orgill. The Proponents objected to this proffer, arguing that Mr. Orgill's testimony does not satisfy the admissibility requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny.

## II. Standard for the Admissibility of Expert Testimony

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowl-

edge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702. Three Supreme Court decisions, taken together, set forth the standards for determining whether expert testimony is admissible pursuant to Rule 702.

■ The first is *Daubert*, wherein the Court stated that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. 2786; *See also United States v. Jones*, 107 F.3d 1147, 1156 (6th Cir.1997). Thus, when confronted with a proffer of scientific expert testimony, a trial court has a "gatekeeping" function that requires it to perform a two-part inquiry. The court must first determine whether the proffered testimony is relevant such that it "will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786; *Smelser v. Norfolk Southern Ry.*, 105 F.3d 299, 303 (6th Cir. 1997). The court must then assess the reliability of the proffered testimony to determine "whether the expert is proposing to testify to ... scientific knowledge...." *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2796; *Smelser*, 105 F.3d at 303.

While the focus of *Daubert* was on the admissibility of scientific expert testimony, the Court recently held that the same two-part inquiry must be made for all proffered expert testimony, scientific or otherwise. *Kumho Tire Co. Ltd., v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999) ("We conclude that *Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."); *see also Cook v. American S.S. Co.*, 53 F.3d 733, 738 (6th Cir.1995) ("A comparable duty [to the

---

1. *See* Amended Joint Disclosure Statement With Respect to Amended Joint Plan of Reor-

ganization at 20.

*Daubert* inquiry] is imposed upon the trial court when the subject of the proposed opinion testimony is not 'scientific' knowledge, but 'technical, or other specialized knowledge.' ").

■ Expert testimony will be relevant if the expert's "reasoning or methodology properly can be applied to the facts in issue." *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786. In other words, the trial court " 'must ensure that the proposed expert testimony is relevant to the task at hand.' " *Smelser,* 105 F.3d at 303 (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1315 (9th Cir.1995) (on remand)); *Kumho,* 526 U.S. 137, 119 S.Ct. at 1175 (Testimony of an expert will be relevant if it has "a valid ... connection to the pertinent inquiry...." (citation omitted)). *See also* Fed. R.Evid. 401 (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

■ The more difficult facet of the *Daubert* inquiry is the reliability component. The purpose of this component is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho,* 526 U.S. 137, 119 S.Ct. at 1176.

■ When assessing reliability, "[t]he focus ... must [generally] be ... on principles and methodology, not on the conclusions that they generate." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. It is not sufficient, however, for the expert's testimony to be based merely upon "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786; *see also General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997) ("[C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extra-

polate from existing data. But nothing in the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Rather, the "[p]roposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Id.* And "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, ... the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.' " *Kumho,* 526 U.S. 137, 119 S.Ct. at 1175 (quoting *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786).

■ The Court has also emphasized that assessing the reliability of an expert's testimony is " 'a flexible' " inquiry. *Kumho,* 526 U.S. 137, 119 S.Ct. at 1175 (quoting *Daubert,* 509 U.S. at 594, 113 S.Ct. 2786). For this reason, many factors may be pertinent to a trial court's determination. *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786. That said, *Daubert* nonetheless set forth a non-exhaustive list of factors that are frequently germane to a determination of reliability:

1) "[W]hether a theory or technique ... can be (and has been) tested;"

2) "[W]hether the theory or technique has been subjected to peer review and publication;"

3) Consideration of "the known or potential rate of error" associated with "a particular scientific technique" as well as "the existence and maintenance of standards controlling the technique's operation;" and

4) Whether the scientific theory or technique espoused has gained "general acceptance" in the scientific field of relevance.

*Daubert,* 509 U.S. at 593–94, 113 S.Ct. 2786. An additional factor recognized by some circuits, including the Sixth, is

> whether the experts are proposing to testify about matters growing naturally and directly out of the research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying because the former provides important, objective proof that the research comports with the dictates of good science.

*Smelser,* 105 F.3d at 303 (citation and internal quotes omitted).

■ It is important to note that the factors listed in *Daubert* may or may not be relevant when a court is assessing the reliability of expert non-scientific testimony. *Kumho,* 526 U.S. 137, 119 S.Ct. at 1175–76. In other words, which factors are pertinent may vary "depend[ing] upon the particular circumstances of the particular case at issue." *Id.,* 526 U.S. 137, 119 S.Ct. at 1175. With these standards of admissibility in mind, we now turn to the proffered expert testimony of Mr. Orgill.

### III. Application of Admissibility Standards to the Testimony of Orgill

■ Mr. Orgill is a certified public accountant whose expertise in the field of accountancy is not disputed. He was asked to provide an opinion on the sufficiency of a fund to satisfy anticipated claims against it. Accountants routinely estimate expenses that are expected to occur in the future so that reserve funds can be established in advance. And per-

forming such estimations is something that Mr. Orgill has done in the past.[2]

If he were permitted to give it, Mr. Orgill's ultimate testimony would be that $400 million will prove clearly insufficient to satisfy all claims against the Litigation Facility. To reach this ultimate conclusion it was necessary for him to make several subsidiary conclusions, which themselves were founded upon certain assumptions and data that he obtained from a number of different sources. Of course, accountants routinely make assumptions, apply them to data provided by others, and draw conclusions therefrom. So far, and from this quite general overview, there is nothing out of the ordinary with Mr. Orgill's methodology or his conclusions. However, a sharper focus reveals much that is quite extraordinary.

The subsidiary conclusions that Mr. Orgill says he needed to reach in order to come to his ultimate conclusion are: (1) the number of claimants who would opt to litigate instead of settle for the amounts offered in the Settlement Facility (the "Opt-in Claimants"); (2) the number of Opt-in Claimants who will accept a settlement offer made by the Litigation Facility and the corresponding number that will reject such an offer and actually try their cases; (3) the average value received by Opt-in Claimants who settle with the Litigation Facility; and (4) the average cost to the Litigation Facility for resolving Opt-in Claims that proceed to litigation (including administrative and defense costs). Of course, none of the subsidiary questions can be answered by a CPA without data and some assumptions.

The best source of data on the first question is the experience of the Revised Settlement Program (RSP).[3] What per-

---

2. Transcript of Hearing, July 16, 1999 at 203.

3. The RSP is a settlement program that is part of the multi-district litigation on silicone gel breast implants pending in the Middle District of Alabama, MDL 926. That settlement program, which is funded by breast implant manufacturer defendants other than Dow Corning, served as the model for the

settlement proposal contained in the Joint Plan. Consequently, it was sensible to look at how claimants responded to the RSP when attempting to determine how claimants in this case would respond to the offer in the Joint Plan. But there were potential obstacles to doing this. First, not all of the data from the RSP is available at this time. Second, while

centage of the eligible claimants opted not to accept the RSP offer, but instead to litigate? This data is available. Mr. Orgill accepted the data compiled by Dr. Fred Dunbar,[4] that the "opt-out" rate from the RSP was 9.1%. But since the RSP settlement offer is not identical to the settlement offers available to claimants in the Joint Plan's Settlement Facility, one cannot use that experience without making an appropriate adjustment. Mr. Orgill recognized this fact, and, as did Dr. Dunbar, proceeded to compare the two programs.[5]

Mr. Orgill testified that the RSP offers higher benefits to those most severely disabled (those who qualify for so-called "Level A" benefits in the RSP) than does the Joint Plan. He also found that, for those who are least disabled, the Joint Plan's offer is more generous. As to the middle group, he found that the respective offers were nearly identical.[6] The witness did not break down the subcategories any further, nor did he do a more precise analysis of the several other differences between the two programs. He did not seek to determine whether a claimant would more easily qualify under the Joint Plan for a certain level of settlement than under the RSP.[7] Nor did he undertake a benefit-by-benefit comparison of the RSP vis-à-vis the Settlement Facility of the Joint Plan.[8] One could, therefore, fault him for imprecision in doing the comparison. But this, alone, would not be sufficient to exclude his opinions.

A much larger oversight was the witness' failure to even attempt to quantify the number of claimants who would qualify for A-level settlements.[9] For example, assume that only 40 claimants have disabilities severe enough to qualify under the RSP's Level A settlement offer, and that there are 50 claimants against the Debtor who have such disabilities. Also assume that 20(50%) of the 40 RSP claimants opted out of the RSP and elected to litigate. If the RSP experience is simply duplicated under the Joint Plan, 25 of the 50 claimants with severe disabilities would elect to litigate in the Litigation Facility. Because, as Mr. Orgill says, the compensation offered by the Joint Plan to claimants with this level of disability is not as generous as the RSP's, more claimants in this category can be expected to opt into the Litigation Facility. But since the universe of such claimants is limited to 50, the maximum increase in the number of litigators from this group is only 25.

Now assume that a large majority of claimants against either fund are made up of people whose disabilities do not qualify for any more than the lowest rung of compensation (so-called Level C in the RSP). Since the compensation offered by the Joint Plan for persons in this category is significantly more generous than the offer in the RSP, a larger percentage of eligible claimants can be expected to accept the settlement offered in the Joint Plan rather than litigate. To make this comparison complete, assume that there are 1,000 claimants eligible under the RSP for level C payments, and that there are 1,250 such claimants against the Debtor's estate. Further assume that 95% (950 claimants) of those eligible for Level C

---

the Joint Plan is modeled after the RSP, there are nonetheless significant differences between the two programs that make a simple one-to-one comparison impossible.

4. Dr. Frederick Dunbar is an economist, presently associated with the National Economic Research Associates, who was called to testify by the Proponents to establish that the $400 million Litigation Facility would be adequate to pay in full the allowed claims of persons who opt not to settle under the terms stated in the Settlement Facility.

5. Transcript of Hearing at 230, 273, 276–277.

6. *Id.* at 273, 276–277.

7. *Id.* at 230–31.

8. *Id.* at 290.

9. Transcript of Deposition of Curtis A. Orgill, June 23, 1999 ("F.R.E. 104 Exhibit 1") at 54.

benefits under the RSP accepted such benefits in lieu of litigating. Because the Joint Plan is significantly more generous, one could anticipate a higher percentage of eligible claimants would accept the Settlement Facility's offer rather than opt into the Litigation Facility. But how much more? Mr. Orgill has no method to answer this question.

It should be clear that there is a gap in the reasoning. Mr. Orgill simply assumes that because some benefits are better in the Joint Plan than in the RSP, some benefits are the same and some benefits are worse, that overall the experience of the RSP is fairly transferable to the anticipated experience under the Joint Plan.[10] But as noted above, this assumption overlooks many subsidiary questions of its own. A proper methodology by an accountant or anyone else would have taken these into account. Mr. Orgill should have determined or attempted to explain a reasonable assumption of how many or what percentage of the RSP claimants were eligible to request Level A, Level B and Level C offers respectively. Without that important input, the conclusion that 10% of all claimants under the Joint Plan (or any other approximation of the 9.1% RSP experience) lacks a sufficient anchor. This shortcoming in Mr. Orgill's reasoning, as was stated earlier, is an aside to the fact that the several differences, particularly with respect to eligibility between the RSP and the Joint Plan, were not accounted for.[11]

The second subsidiary conclusion which Mr. Orgill would have relied upon is that some percentage of those opting into the Litigation Facility will settle out before trial, leaving the rest to litigate in court. The only "methodology" Mr. Orgill used to provide this subsidiary conclusion was to call two attorneys with whom he was personally familiar and ask them what they thought. Without going any further, this methodology is far from satisfactory. But the details of this "research" truly makes a mockery of the process.[12] Mr. Orgill testified that the night before his first deposition (which was conducted on June 23, 1999), he called Karla Butko and Gordon Muir. Ms. Butko is primarily a criminal defense attorney and Mr. Muir is an attorney/estate planner who also does some business work.[13] Mr. Orgill recognizes that neither of them has relevant civil litigation experience.[14] Nevertheless, he accepted without verification their assertion that about 90% of all civil cases settle. From that casual form of research, he proceeded to extrapolate that 10% of those who opt into the Litigation Facility would ultimately proceed to trial. We are given to understand that if allowed to testify, Mr. Orgill would amend this conclusion based on new or better information he since obtained. However, Mr. Orgill did not explain this new methodology or the source of the new information.[15]

---

**10.** Transcript of Hearing at 271.

**11.** We assume that his failure to take this important factor into account is attributable to the pressures of time. *See* p. 374 *infra.*

**12.** Facing a deposition the next day and not having any way to finish his calculations without an assumption on the percentage of lawsuits which settle, Mr. Orgill evidently did the best thing he could think of to do under the circumstances. But a certified public accountant would hardly be justified in presenting an opinion derived in such a manner to a board of directors at a meeting the following morning. And a board would be poorly advised if it relied on such an opinion to make an important corporate decision. Testifying

as an expert in a trial of this magnitude deserves no less care.

**13.** F.R.E. 104 Exhibit 1 at 23–27; F.R.E. 104 Exhibit 3 (papers upon which Mr. Orgill testified he relied in reaching his conclusions) at 3, entitled "Assumptions" ("8. 90% of those choosing to litigate will ultimately settle . . . .").

**14.** F.R.E. 104 Exhibit 1 at 25–26.

**15.** At trial, Mr. Orgill changed his testimony on this point. He stated that he derived the percentage of Opt-in Claimants who would settle in the Litigation Facility solely from reading the deposition of John Thornton, a personal injury attorney, and speaking with

The third and fourth subsidiary issues deal with the value of a personal injury claim. As Mr. Orgill does not purport to have any expertise in this area, again he had to rely on data supplied by others. With respect to the third subsidiary issue, Mr. Orgill stated that the best source of data would be the experience of the non-Dow Corning breast implant manufacturers with plaintiffs who did not accept the RSP offers.[16] Unfortunately, as a result of rulings in the multi-district litigation on silicone gel breast implants, MDL 926, pending in the Middle District of Alabama, this data is unavailable.

Accountants will attempt to use the best data available, and sometimes it is from a secondary source.[17] In this case, in the absence of the primary data, Mr. Orgill attempted to do the best he could by substituting data about the average settlement value of cases which settled *within* the RSP. To obtain this secondary information, Mr. Orgill first spoke with John Thornton, a personal injury attorney who formerly represented a large number of breast implant claimants, and who was previously associated with counsel for the Nevada Claimants.[18] Mr. Thornton indicated that he (or members of the firm with which he was previously associated) settled claims in the RSP for an average of be-

tween $25,000 and $30,000 per case, and that other attorneys with whom he had spoken reported similar settlement results.[19] Mr. Orgill then did some calculations on the reported numbers of cases settled in the RSP and the total amount paid to settle these cases and determined that the average settlement amount was $27,000, which was within the range testified to by Mr. Thornton.[20]

But $27,000 is the price that manufacturers had to pay to settle claims in the RSP. That is not the price they had to pay to settle the claims of those who opted out of the RSP. Because he had no way to calculate whether and to what extent settlements for those who opted out of the RSP were higher or lower than settlements within the RSP, the witness likewise had no basis to claim that the settlements in the Litigation Facility of the Joint Plan would be higher or lower than the average settlements in the Settlement Facility.[21] The methodology used by Mr. Orgill to fill in this gap in the data was to adopt one of Dr. Dunbar's conclusions.[22] Dr. Dunbar concluded that the Litigation Facility could expect to pay a settlement that was 2.1 times the amount of the settlement which was offered to a claimant in the Settlement Facility, but rejected.[23]

him the previous night (July 15, 1999). In immediate response to that concession, the Court ruled Mr. Orgill's proposed testimony on this subsidiary question inadmissible as inherently unreliable. Transcript of Hearing at 279. Whether the truth is that Mr. Orgill took the rough, casual estimates of his lawyer-acquaintances or the assertions of Mr. Thornton, the informality of this approach to obtaining relevant input renders the result unreliable.

16. Transcript of Hearing at 266–67.

17. *Id.* at 215, 266–67.

18. *Id.* at 245–46.

19. *Id.* at 245–46, 262, 286.

20. *Id.* at 262–264.

21. Indeed, he acknowledged that there is an unresolved issue of whether the population of

individuals who opt out is similar to the population who settle. Transcript of Hearing at 287.

22. *Id.* at 245.

23. The actual result of multiplying $27,000 by 2.1 was never stated at trial. Nor were the other subsidiary conclusions and the ultimate conclusion which the Nevada Claimants sought to elicit from Mr. Orgill. There was the concern that the Court should not hear testimony about the results of the various calculations lest the Court, as trier of fact, be misled by opinions which may ultimately prove inadmissible. In retrospect, this was a mistake. The method used impeded the questioning of the witness and made the whole process go in a most unnatural and unwieldy manner. While we recognize that the Federal Rules of Evidence apply in bench trials and that inadmissible expert testimony should be excluded there as well as in jury trials, we

As noted, there is this gap in the data which is problematic for anyone attempting to estimate an average settlement value for cases that will settle within the Litigation Facility. Another expert who testified in this case encountered a similar gap. Rather than relying on statements of friendly witnesses, this expert looked to what he thought was a comparable mass tort settlement. Dr. Dunbar reviewed the completed data of the Dalkon Shield Claimants' Trust in the A.H. Robins bankruptcy case. The data in that case included what is missing from the RSP. A claimant against the Dalkon Shield Claimants' Trust was given an offer. If the claimant rejected the offer, the claim was placed on a litigation track (after the claimants had jumped through several hoops).[24] Ultimately, most of the cases of those people who rejected the original offers were settled without trial. Dr. Dunbar obtained data regarding the amount of the rejected original settlement offers and the ultimate settlements achieved. The data showed that the ultimate disposition of those cases settled after rejection of the initial offer was 210% of the original rejected offer. That is the derivation of the 2.1 multiplier used by Dr. Dunbar in his testimony and adopted by Mr. Orgill in his. What is important to note here is that Mr. Orgill was adamant in his rejection of Dr. Dunbar's use of the Dalkon Shield Claimants' Trust experience in this case.[25] Yet, an important result of Dr. Dunbar's use of the Dalkon Shield Claimants' Trust experience was the obtaining of the 2.1 multiplier, and that is precisely what Mr. Orgill adopted.

The other fruit which Dr. Dunbar obtained from comparison with the Dalkon Shield Claimants' Trust experience was the perhaps counter-intuitive finding that most claimants which opted not to settle at the initial settlement offer were those with less serious injuries. This experience runs counter to Mr. Orgill's assumption, and shared by others perhaps, that those people who will opt to litigate are those with the most serious claims.[26] But at least according to Dr. Dunbar, the Dalkon Shield Claimants' Trust experience was to the contrary.

recommend to other trial courts not to follow our example. Instead, take the proffered testimony altogether—both substantive conclusions and testimony on methodology, etc.—and disregard whatever proves to be inadmissible. *See, e.g., The Ekotek Site PRP Committee v. Self*, 1 F.Supp.2d 1282, 1296 n. 5 (D.Utah 1998); *Fierro v. Gomez*, 865 F.Supp. 1387, 1395 (N.D.Cal.1994).

In any event, Mr. Orgill conceded that, whatever the result, it was about 50% less than the original conclusion he offered at his deposition on June 23, 1999. This enormous change in his testimony results from the fact that he originally obtained his "data" from Dr. Mary White Stewart, a sociologist and social psychologist, and sister of the lawyers for the Nevada Claimants. Dr. Stewart's testimony was excluded as unreliable under the standards of *Daubert* earlier in the trial. An expert is permitted to rely on hearsay and inadmissible evidence of various sorts in reaching his or her own conclusions. Thus, it is not immediately apparent why Mr. Orgill should have had to change his testimony, especially so drastically, merely because the opinion testimony of another upon whom he relied was excluded by the Court. Nevertheless, Mr. Orgill abandoned his original opinion on the average settlement value of cases settled within the Litigation Facility ostensibly for this reason.

**24.** *See* Georgene M. Vairo, *The Dalkon Shield Claimants Trust: Paradigm Lost (Or Found)?*, 61 Fordham L.Rev. 617, 630–31 (1992).

**25.** *See, e.g.,* Transcript of Deposition of Curtis A. Orgill, July 10, 1999 ("F.R.E. 104 Exhibit 2") at 96, lines 23–25 ("I disagree that the Dalkon Shield case is really applicable in this one."); *id.* at 141, line 7 ("I don't believe they're comparable.").

**26.** Dr. Dunbar's finding was also contrary to the Court's own initial and uneducated assumption. As product liability trials are expensive, one would naturally expect that a plaintiffs' attorney will normally seek to settle the less serious and try the most serious cases. However, many who opt into the Litigation Facility may be unrepresented by counsel. And Opt-in Claimants who are represented by counsel may choose to go to the Litigation Facility merely in an attempt to extract a larger settlement, without expecting to try the case.

Dr. Dunbar's explanation is consistent with the testimony of Mr. Thornton on this point. Mr. Thornton testified that a seriously disabled or disfigured plaintiff who succeeds in a silicone gel breast implant product liability case could expect to receive a large award indeed. However, there are risks in litigating, one of which is the significant likelihood of a defense verdict. The litigation climate for plaintiffs, he admitted, has worsened. Similar testimony was offered by other witnesses in the case. Since a seriously disabled or disfigured claimant is being offered, through the Settlement Facility, a substantial recovery without having to prove liability, it would be reasonable to counsel the more severely injured or disfigured claimants to accept the bird in the hand rather than the two in the bush. In fact, he testified that all of the 700 silicone gel breast implant claimants represented by his former firm that were involved in the RSP settled their claims—90% of them at the grid amounts. What is important here is not that Mr. Orgill disagrees with Dr. Dunbar on this point. What is important here is that Mr. Orgill found it convenient to adopt the 2 .1 multiplier derived from Dalkon Shield Claimants' Trust data while at the same time adamantly insisting— without any apparent expertise to do so— that the experience of that trust is totally inapposite to this case. Without using the Dalkon Shield-derived 2.1 multiplier, the witness has no methodology to translate the average settlement amounts within the RSP to anticipated average settlement outcomes in the Joint Plan's Litigation Facility.

The fourth subsidiary issue which Mr. Orgill says was necessary for him to opine on the sufficiency of the Litigation Facility funding is the average cost to the Litigation Facility of litigating claims to conclusion. With respect to this issue, Mr. Orgill recognizes that what he is seeking to determine is how much the Litigation Facility will actually have to pay out of pocket to claimants who take their cases to court.[27] But rather than using data finely honed to answer this question, the witness accepted what he knew to be insufficient.[28] Mr. Orgill looked at something called the Mealey's Reports, which is a compilation of verdicts in silicone gel breast implant litigation. It reports verdicts only.[29] Mr. Orgill averaged all verdicts including the verdicts rendered before the scientific studies of recent vintage were issued .[30] In these verdicts were a large number of defense verdicts which were calculated at zero dollars.[31] Mr. Orgill's simple division yielded him a number which he uses as the plug value of the average litigation outcome for the Litigation Facility in this case. What Mr. Orgill recognized, but refused to account for was the fact that litigation rarely results in a verdict. Many cases are dismissed for technical reasons or are thrown out on summary judgment before they ever get to a jury. Some plaintiffs' verdicts are overturned on appeal leaving the plaintiffs with nothing. Some plaintiffs' verdicts are reduced by remittitur (or enhanced by additur). And some cases settle for less than the amount awarded by jury even after verdict. While he acknowledged all of this, he made no effort to quantify these considerations.[32]

Although this was his original and apparently primary methodology, Mr. Orgill utilized an alternative at trial. As an alternative, he simply adopted the testimony

---

27. Transcript of Hearing at 250.

28. *Id.* at 250–54. *See also* F.R.E. 104 Exhibit 2 at 121–124, 126–130, 143–145.

29. Transcript of Hearing at 282; F.R.E. 104 Exhibit 2 at 124.

30. Transcript of Hearing at 283; F.R.E. 104 Exhibit 2 at 145–46.

31. Transcript of Hearing at 283.

32. *Id.* at 250–54. *See also* F.R.E. 104 Exhibit 2 at 135 (acknowledging that there was no accounting methodology which permitted him to assume that reported verdicts can be used without adjustment to extrapolate the out-of-pocket cost to a defendant of paying litigating plaintiffs). ·

of Dr. Dunbar that the average cost of a litigation outcome would be $88,000 and then adjusted it upward to $100,000 based on additional data, which he did not identify.[33]

The Supreme Court has instructed us to ensure that the proffered expert testimony is based on reliable data and methodology. This view holds for all forms of expert opinion testimony, not just scientific. *Kumho*, 526 U.S. 137, 119 S.Ct. at 1171. Mr. Orgill is being proffered as an expert. Therefore, his opinions must be supported by reliable data and methodology. Indeed, he recognizes this fact.[34] While Mr. Orgill acknowledges these requirements of his profession, his efforts to adhere to them fell far short.[35] The Court expresses sympathy for Mr. Orgill's plight. We have no doubt that given the proper time to do the job, he would have been far more thorough in his preparation.[36] Yet evidence is either admissible or it is not. The party seeking to elicit the expert testimony bears the burden of establishing the testimony's admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 593 n. 10, 113 S.Ct. 2786. Because the Nevada Claimants failed to establish that Mr. Orgill's opinions are based on reliable data and methodology, the evidence may not be admitted. Accordingly, the Proponent's objection to Mr. Orgill's opinion testimony is sustained .[37]

33. *Id.* at 282, 284–85, 289–90.

34. F.R.E. 104 Exhibit 2 at 90–92 (admitting that an important standard of practice for an accountant in attempting a task such as his is to consider the quality and reliability of the material provided to him).

35. He also repeatedly failed to identify any "standard, convention or methodology" he used in deriving his subsidiary conclusions. *See, e.g.,* F.R.E. 104 Exhibit 2 at 107 (pertaining to the percentage of claimants who would opt into the Litigation Facility).

36. *See, e.g.,* Transcript of Hearing at 241 (Explaining why he did not survey other attorneys, Mr. Orgill said, "[L]ast night when it was quite late I didn't have any opportunity to try and do that."); *id.* at 247 ("Well since we talked about that late last night I haven't ha[d] the opportunity to do that."); *see also* F.R.E. 104 Exhibit 2 at 140 (explaining that he lacked the time to verify reported verdicts).

37. The Court reserves the right to edit this opinion for style should it be submitted for publication.