**Barbara Jean BERRY,
et al., Plaintiffs,**

v.

**SCHOOL DISTRICT OF THE CITY
OF BENTON HARBOR, et al.,
Defendants.**

**No. 4:67–cv–9.**

United States District Court,
W.D. Michigan,
Southern Division.

May 11, 2001.

Kathleen McCree Lewis, Dykema Gossett, PLLC, Detroit, Steven Marchese, Syracuse University College of Law, Office of Clinical Programs, Syracuse, NY, for plaintiffs.

John D. Tully, Warner, Norcross & Judd LLP, Grand Rapids, MI, George T. Roumell, Jr., William Ferguson Dennis, Riley Roumell & Connolly, PC, Detroit, MI, Timothy P. Gladney, Ann Arbor, Edith C. Harsh, Jennifer M. Granholm, Attorney General, Executive Division, Jane Orris Wilensky, Jennifer M. Granholm, Attorney General, Education Division, Lansing, MI, Rocco E. Testani, Sutherland, Asbill & Brennan, Atlanta, GA, Jeffrey J. Butler, LaPointe & Associates, PC, Okemos, MI, for defendants.

## OPINION RE BURDEN OF PROOF

HILLMAN, Senior District Judge.

This 34–year–old school desegregation case has been the subject of numerous prior opinions of this court. The case is scheduled for a unitary status hearing beginning July 24, 2001. The matter presently is before the court on cross motions in limine (dkt## 1553, 1556) regarding which party bears the burden of proof as to whether vestiges of student achievement disparities caused by past discrimination have been eliminated to the extent practicable. For the reasons that follow, the court concludes that defendants bear that burden. Accordingly, defendants' motion in limine (dkt # 1553) is **DENIED** and plaintiffs' motion (dkt # 1556) is **GRANTED.**

## I. BACKGROUND

This case began on November 16, 1967, with the filing of a complaint by plaintiffs Barbara Jean Berry, et al., as parents of African–American children then attending the public schools of Benton Harbor, Michigan, against the School District of the City of Benton Harbor ("BHASD"), the members of its Board of Education and its Superintendent. In the complaint, the plaintiffs sought preliminary and permanent injunctive relief as to various acts and practices of the defendants, which plaintiffs deemed to be discriminatory or segregative. In July 1971, the district court found several practices carried out by the defendants to be constitutionally discriminatory. On November 1, 1974, the Sixth Circuit Court of Appeals affirmed the district court's findings that the practices were discriminatory and that plaintiffs had made out a prima facie case of *de jure* segregation.

On August 21, 1974 and September 25, 1975, plaintiffs added the following defendants to the case: the State of Michigan, the Attorney General of the State of Michigan, the Michigan State Board of Education, the Superintendent of Public Instruction (collectively, "the State of Michigan defendants" or "State"), the Boards of Education of the Eau Claire Public Schools ("Eau Claire") and the Coloma Community Schools ("Coloma"), and the Berrien County Intermediate School District and its Superintendent ("BCISD").

On August 22, 1977, following a trial on the liability of Benton Harbor Area School District (Phase I trial), the district court (then Chief Judge Noel P. Fox) ordered that the case be certified as a class action under Rule 23 of the Federal Rules of Civil Procedure. The class was identified as "all present and future students within the Benton Harbor Area School District." This class annually contains approximately 6,000 students. The court also found defendant Benton Harbor Area School District guilty of acts of segregation in violation of the United States Constitution. The court specifically found that the BHASD engaged in multiple attendance practices that fostered racial segregation in district schools; provided lower levels of physical facilities and materials to identifiably black schools than to identifiably white schools; assigned teaching and administrative staff on the basis of race; engaged in a discriminatory tracking program at one junior high school; and cooperated in the efforts of white portions of the district to secede and join other predominantly white school districts.

On August 7, 1978, following a second liability trial (Phase II trial), the district court ruled against the State of Michigan defendants, the Berrien County Intermediate School District and its Superintendent, and the Coloma and Eau Claire School Districts and their Superintendents, finding that they had helped to create, perpetuate or contribute to the unlawfully segregated conditions in the Benton Harbor Area School District. The district court issued an amended order requiring the defendants found liable in Phases I and II to formulate a plan to remedy the constitutional violations.

In February 1980, the case was reassigned to the undersigned for remedial proceedings. Following a remedy trial, the court entered its Opinion and Order on May 1, 1981, adopting and ordering the implementation of a desegregation plan. In summary, this plan: (1) ordered the Eaman residential area be returned to the Benton Harbor Area School District; (2) enjoined the transfer of the Sodus II residential area from the Benton Harbor Area School District to the Eau Claire Public School District; (3) ordered the Benton Harbor Area School District to eliminate racially identifiable schools; (4) ordered the creation of magnet programs in the Benton Harbor Area School District; (5) ordered a voluntary program for interdistrict transfers of students between the Benton Harbor, Coloma and Eau Claire School Districts; (6) ordered further remedies relating to student achievement and social skills, curriculum, faculty and staff reassignment and affirmative action goals, in-service training, student discipline, community involvement, monitoring and reporting, and for financing of the court's remedial plan. On January 24, 1983, the Sixth Circuit Court of Appeals affirmed the May 1, 1981, remedial order. Certiorari was denied by the United States Supreme Court on October 11, 1983. *Berry v. School Dist. of the City of Benton Harbor,* 698 F.2d 813 (6th Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 235, 78 L.Ed.2d 227 (1983).

In September 1991, following ten years of implementation of the remedial plan, defendants Coloma, Eau Claire, BCISD and the State of Michigan filed separate motions requesting the court to terminate its supervision and control and to declare the school districts unitary. In December 1993, with the court's encouragement, the parties undertook settlement negotiations and the motions for unitary status were administratively dismissed, subject to renewal if the parties could not agree to settlement terms.

In 1996, this court considered a proposed partial settlement between plaintiffs and defendants Coloma, Eau Claire and the State. Following a preliminary approval hearing, notice and a fairness hearing, this court rejected the 1996 proposed partial settlement, concluding that it was neither fair, adequate nor reasonable. Subsequently, in June 1998, Coloma, Eau Claire, the BCISD and the State filed a joint motion to approve two partial settlement agreements, which were accepted as consent decrees by the court in August 1998 following a fairness hearing. If the parties comply with the terms of the consent decrees, Coloma, Eau Claire and the BCISD will be granted dismissal from this action upon motion filed after the end of three years following implementation of the settlement.

Many years after the remedial order was entered, the State of Michigan adopted a variety of changes to state education programs, including the implementation of a new method of funding local schools, the authorization of public school academies (charter schools), and the allowance of out-of-district students to attend district schools (schools of choice). The impact of these generally applicable state education changes on the remedial order has been the subject of a number of opinions of this court.

Finally, after numerous but unsuccessful attempts by the non-settled parties to resolve their remaining dispute, renewed motions for unitary status have been filed by both the State and the BHASD. Those motions are set to be heard at an evidentiary hearing scheduled to begin July 24, 2001. Plaintiffs also have filed a motion to modify the existing remedy. Should the court deny defendants' motions for unitary status, the court will schedule a hearing on any further issues necessary to decide plaintiffs' motion.

At a hearing to address various motions, held January 18, 2001, the parties raised for the first time a dispute about which party bears the burden of proof on the existence of vestiges of past discrimination with respect to student achievement. This court ordered the parties to file motions and briefs on the issue and the matter is now before the court on cross motions in limine on the burden of proof (dkt ## 1553, 1556).

## II. DISCUSSION

"The duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system." *Freeman v. Pitts*, 503 U.S. 467, 485, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992). The present dispute requires this court to determine whether, when a defendant has moved for unitary status, certain "vestiges" previously found to have been caused by past discrimination should be treated differently for analytical purposes from other such "vestiges."

The Supreme Court has articulated a three-part framework for the exercise of federal court authority to fashion remedies for a school district that has been found to be segregated in law in violation of the Fourteenth Amendment. *See Missouri v. Jenkins ("Jenkins III")*, 515 U.S. 70, 87–88, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995). First, any such remedy must be determined by the nature and scope of the constitutional violation at issue. *Id.* (citing *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)). Second, the decree "must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.'" *Id.* (quoting *Milliken v. Bradley ("Milliken I")*, 418 U.S. 717, 738, 94 S.Ct. 3112, 41

L.Ed.2d 1069 (1974)). Third, in devising a remedy, a federal court must take into consideration "the interests of the state and local authorities in managing their own affairs, consistent with the Constitution." *Id.* at 88, 115 S.Ct. 2038.

In imposing a remedy and determining whether a unitary district has been reestablished, the Court has identified six important indicia of a racially segregated school system: "student assignments, ... faculty, staff, transportation, extracurricular activities and facilities." *Id.* (quoting *Green v. County School Bd. of New Kent County,* 391 U.S. 430, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)). Those six factors, hereafter, the "*Green* factors," have been identified by the Court as deficiencies considered to be *per se* vestiges of discrimination. *Id.* The Court has acknowledged that *Green* does not set forth the only factors that may be implicated by segregative practices. *See Jenkins III,* 515 U.S. at 88–89, 115 S.Ct. 2038 ("[W]e have identified 'student assignments, ... faculty, staff, transportation, extracurricular activities and facilities' as *the most important* indicia of a racially segregated school system.") (emphasis added). Indeed, the Court specifically has recognized that disparate student achievement and other ancillary effects in addition to the *Green* factors may properly be attributable to past *de jure* discrimination. *Id.* at 90, 115 S.Ct. 2038; *see also Milliken v. Bradley* ("*Milliken II*"), 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977).

In deciding a motion for unitary status, the ultimate inquiry for this court is " 'whether the [constitutional violator] ha[s] complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable.' ". *Freeman,* 503 U.S. at 492, 112 S.Ct. 1430 (quoting *Dowell,* 498 U.S. at 249–50, 111 S.Ct. 630), *quoted in Jenkins III,* 515 U.S. at 88, 115 S.Ct. 2038. It is well established that defendants bear the burden of proof on their compliance with remedial orders and on the existence of any vestiges of the *Green* factors. *See Freeman,* 503 U.S. at 494, 112 S.Ct. 1430 (1992) (reaffirming that until unitary status is attained, the defendant school board has the burden of showing that any racial imbalance in the school system is not traceable to the prior *de jure* segregation). The Supreme Court has never specifically addressed which party bears the burden of proof of unitariness on such ancillary disparities as student achievement that originally were found to have been cause by past segregative conduct. The Court has broadly held, however, that once there has been a finding that a defendant established an unlawful dual school system leading to a particular racial disparity, a presumption exists that any current disparity is the result of the defendant's unconstitutional conduct. *See Keyes v. School Dist. No. 1,* 413 U.S. 189, 208–11, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). Following a finding that "the unlawful *de jure* policy of a school system has been the cause of the racial imbalance ..., [the defendant] bears the burden of showing that any current imbalance is not traceable, in a proximate way, to the prior violation." *Freeman,* 503 U.S. at 494, 112 S.Ct. 1430.

Moreover, in *Jenkins III,* the Supreme Court specifically recognized the propriety of a district court attempting "to remedy the system-wide reduction in student achievement" that had been found to have resulted from past discrimination. *Id.* at 91, 115 S.Ct. 2038. The Court stated that in imposing any remedy,

> the proper response by the District Court should have been to eliminate to the extent practicable the vestiges of prior de jure segregation within the

KCMSD: *a system-wide reduction in student achievement* and the existence of 25 racially identifiable schools with a population of over 90% black students. *Id.* (emphasis added). Thus, the Court implied that student achievement vestiges should be treated like other indicia of a segregated school district. Admittedly, the *Jenkins III* Court criticized unlimited consideration of student achievement disparities where those disparities were not connected to past discriminatory conduct. In particular, the Court rejected efforts to improve schools when school improvement was used as a tool to create "desegregative attractiveness"—that is, to bring non-minority out-of-district students into the system. The Court held that where as in *Jenkins,* no inter-district segregation was found, no remedy to alleviate inter-district segregation is appropriate. The Court's stated concern that any remedy be linked to the past violation is not unique to student achievement vestiges. It is consistent with the general principle that "the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation." *Swann,* 402 U.S. at 16, 91 S.Ct. 1267; *see also Freeman,* 503 U.S. at 494, 112 S.Ct. 1430 ("Racial balance is not to be achieved for its own sake. It is to be pursued when racial imbalance has been caused by a constitutional violation.").

Further, the Supreme Court has never suggested that the burden of proof on whether student achievement vestiges have been eliminated should be different from the burden of proof on the *Green* factors. In fact, I note that the dissent in *Jenkins III* specifically assumed that had the State moved for unitary status on the achievement issue, it would have borne the burden of proof. *Id.* at 150, 115 S.Ct. 2038 ("The burden of showing that these conditions to finding partial unitary status has been met rests (as one would expect)

squarely on the constitutional violator who seeks relief from the existing remedial order.") (citing *Freeman,* 503 U.S. at 494, 112 S.Ct. 1430). Thus, the Supreme Court decisions in *Freeman* and *Jenkins III* strongly suggest that the burden of proof for all previously found vestiges of discrimination lies with the constitutional wrongdoer.

Defendants contend, however, that in this circuit, pursuant to *Oliver v. Kalamazoo Bd. of Educ.,* 640 F.2d 782, 810–12 (6th Cir.1980), disparities in student achievement are not presumptively connected to past segregative practices. Defendants assert, therefore, that the burden of proof regarding the existence of any student achievement vestige rests on plaintiffs.

In *Oliver,* the Sixth Circuit considered whether several years after the imposition of its initial remedial order, the district court could issue a supplemental order requiring the State to pay for extensive remedial educational programs. The court stated that it might be reasonable for a court "in ordering ancillary programs, [to] presume that the disparity in achievement was related to the segregated schools" when that order is issued at the time of the original finding of discrimination. *Id.* However, the court held in 1977 that "[w]e believe that it is unrealistic to presume that this disparity in achievement is related to school segregation that ended in 1971 and that the district court erred in so presuming." *Id.*

The question before the court in *Oliver* was whether the district court could impose a supplemental remedy several years after the initial desegregation order. Indeed, the Sixth Circuit phrased the issue as follows:

The question before the district court that is now being reviewed was whether the desegregation plan that had been in

effect since 1971 should be modified or altered by requiring the implementation of the extensive and expensive Green–Cohen recommendations as well as by requiring the continuation of the ESAA program.

*Id.* at 808. The Sixth Circuit specifically relied on the fact that the original remedial order in *Oliver* was limited to desegregating the facilities and teaching staffs, "*and the ancillary relief then sought by plaintiffs-appellees was not granted.*" *Id.* at 810 (emphasis added).

Here, in contrast, the issue is whether the court should terminate jurisdiction by granting unitary status. Unlike in *Oliver*, this court expressly found at the time of the remedial order in 1981 both that student achievement deficits in Benton Harbor were vestiges of past segregative conduct by the defendants and that imposition of ancillary relief was necessary to eliminate the vestiges of that past discrimination. *Oliver*, therefore, is distinguishable because the case addressed the question of who should bear the burden of proof for imposing a supplemental remedy rather the burden of proof for finding unitary status and for terminating federal court jurisdiction.

*Oliver* also is distinguishable from the instant case in that the remedial order in *Oliver* itself placed the burden of proof for changing the remedial order squarely on the party seeking the change, a circumstance the Sixth Circuit expressly considered. *Id.* at 809. Further, at least two courts of appeal have concluded that *Oliver* rests on the district court's presumption that the *Oliver* defendants had achieved unitary status at the time of the proposed imposition of supplemental ancillary relief. *See Jenkins v. Missouri ("Jenkins XIV")*, 122 F.3d 588, 593 (8th Cir.1997); *Vaughns v. Board of Educ.*, 758 F.2d 983, 991 (4th Cir.1985). Although I do not accept that the *Oliver* decision rested on a finding of unitary status, the *Oliver* court clearly found it relevant that a period of court-ordered integration of the schools preceded any finding that existing student achievement vestiges were caused by previously existing segregation. Hence the burden of proof was properly on the plaintiffs. Here, in contrast, no such remedial period took place before the court found that segregation had caused student achievement deficits and that ancillary relief was required to remedy those deficits.

In sum, *Oliver* decided a different question from that faced by this court. *Oliver* stands for the proposition that when a district court attempts to impose an additional remedy to address student achievement vestiges unaddressed at the time of the original remedy some years previously, the burden of proof is on the plaintiffs to show that any remaining student achievement disparity is related to the past segregative practices. The *Oliver* court neither considered nor decided where the burden of proof should rest when the court made an initial finding that achievement deficits were caused by *de jure* segregation and imposed a remedy for those deficits, as this court did at the time of the 1981 remedial order. *Oliver*, therefore, is not dispositive of this case.[1]

While defendants principally rely upon *Oliver*, they also cite *United States v. City of Yonkers (Yonkers I)*, 181 F.3d 301, 310–311 (2d Cir.1999), *vacated*, 197 F.3d 41 (2d

---

1. Moreover, I note that *Oliver* was decided long before the Supreme Court decisions in *Freeman* and *Jenkins*, both of which strongly suggest that the burden of proof always lies with defendant to demonstrate that those vestiges of past discrimination originally found by the district court have been eliminated to the extent practicable. Such potential conflict strongly supports limiting *Oliver* to the narrow question it decided.

Cir.1999) (*Yonkers II*). In *Yonkers I*, the Second Circuit held that the district court erred in placing the burden of proof on the state regarding the existence of vestiges of student achievement deficits. The court held that the school district and plaintiffs bore the burden of proof because no vestiges of *Green* factors existed and because the school district and plaintiffs both sought to extend the remedy beyond the initial order.

The *Yonkers I* decision has subsequently been vacated, and the panel on rehearing expressly declined to decide the issue of burden of proof because its result did not depend on which party bore that burden. *See Yonkers II,* 197 F.3d 41. The *Yonkers I* decision, therefore, provides no authority on the issue.

Moreover, the reasoning of the original decision is based on circumstances entirely distinct from this case. First, in deciding that the burden of proof did not lie with the defendant state, the *Yonkers* panel expressly considered that the wrongdoer school district, which had the best access to relevant information, had joined plaintiffs in asserting that vestiges remained. Second, the original finding of segregative effects did not include student achievement deficits, but instead found only that the corollary issues of teacher expectations and lack of multiculturalism were related to past discrimination. Third, the case, like *Oliver,* involved supplemental remedial efforts. As a result, *Yonkers I,* even were it good law, would be entirely distinguishable.

Defendants also cite *Coalition to Save Our Children v. State Bd. of Educ.,* 90 F.3d 752, 776 (3d Cir.1996). In *Coalition,* however, as in *Oliver,* the court considered a situation in which the alleged educational deficits were not among the ancillary remedial relief orders originally issued. Consequently, the burden to prove that current disparities were vestiges properly remained on the plaintiffs. Indeed, in reaching its conclusion, the court expressly distinguished between those disparities that were the subject of the original relief orders and those that were not. It did not, however, distinguish between the *Green* factor vestiges and ancillary vestiges. The reasoning of *Coalition to Save Our Children,* therefore, supports placing the burden of proof on defendants in the instant case.

Finally, defendants cite *School Bd. of the City of Richmond v. Baliles,* 829 F.2d 1308, 1313 (4th Cir.1987). While citing the case, however, defendants acknowledge that *Baliles* expressly declined to address whether the mere passage of time could serve to dissolve the presumption that present achievement disparities were connected to past discrimination. In fact, the *Baliles* court explicitly rejected one of the district court's reasons for placing the burden of proof on plaintiffs, holding that "[t]he allocation of the burden is not related to the nature of the educational disparity." *Id.* at 1311.

As a result, none of the cases cited by defendants decide the precise issue before this court. Instead, the Eighth Circuit is the only court that has squarely addressed and comprehensively discussed the issue of which party has the burden of proof when the original remedial order contained findings that student achievement vestiges were caused by past *de jure* segregation. *Jenkins XIV,* 122 F.3d at 593. In *Jenkins XIV,* the court held that the burden of showing that a district has attained unitary status on the issue of student achievement lies with the constitutional violator, just as with all other disparities previously found to have been caused by defendant's unconstitutional conduct. *Id.* at 593 (8th Cir. 1997). The *Jenkins XIV* decision has been followed by district courts in this circuit.

See *Reed v. Rhodes*, 1 F.Supp.2d 705, 711 (N.D.Ohio 1998); *Hampton v. Jefferson Co. Bd. of Ed.*, 102 F.Supp.2d 358, 362 n. 3 (W.D.Ky.2000).

In *Jenkins XIV*, the Eighth Circuit reasoned that where "the court already specifically found that student achievement in the district has suffered as a result of the dual system ...," a presumption exists that any remaining disparity in student achievement is caused by the past segregative conduct. *Id.* at 594. The *Jenkins XIV* court relied upon the general principles established by the Supreme Court in *Freeman* and *Jenkins III*. *Id.* at 593–94. The court recognized that the Supreme Court had contemplated that where student achievement deficits have been found to be the result of *de jure* segregation, a court is to create a remedy to eliminate those deficits. *Id.* at 595 (citing *Jenkins III*, 515 U.S. at 90, 115 S.Ct. 2038). The court held that the distinction between the *Green* factors and ancillary vestiges such as student achievement is that once a defendant has been found guilty of *de jure* segregation, disparities in the *Green* factors are presumed to be vestiges. Ancillary vestiges, in contrast, "may or may not be found in a particular case and may or may not be the result of a segregated or dual system." *Id.* at 594. As a result, "the presumption of causation will only be applied to student achievement disparities if the court has already specifically found that student achievement in the district has suffered as a result of the dual system." *Id.* (citing *Coalition to Save Our Children*, 90 F.3d at 776–77).

Defendants argue, however, that with the passage of time, student achievement vestiges are far less likely to be related to prior discrimination than are vestiges of the *Green* factors. They therefore argue that based on the passage of time alone, student achievement vestiges may not be presumed to be related to past segregation.

As the Eighth Circuit recognized, "the *Green* factors can also be affected by forces outside the defendants' control." *Jenkins XIV*, 122 F.3d at 594 (quoting *Jenkins III*, 515 U.S. at 102, 115 S.Ct. 2038 ("Just as demographic changes independent of *de jure* segregation will affect the racial composition of student assignments, so too will numerous external factors beyond the control of the KCMSD and the State affect minority student achievement.")). The determination of whether remaining disparities reflect past discrimination or other factors is an evidentiary one. "The burden of proof rules are simply the framework for making that inquiry." *Jenkins XIV*, 122 F.3d at 594.

I agree with the Eighth Circuit's reasoning and with its reading of Supreme Court authority. Where, as here, plaintiffs originally proved that student achievement vestiges were the result of past segregative conduct and that those vestiges warranted ancillary relief, the defendant is an adjudicated wrongdoer with adjudicated responsibility for the harm at issue. In such circumstances, the burden lies with defendant to demonstrate that student achievement vestiges have been eliminated to the extent practicable.

In sum, I am persuaded that the *Oliver* case is not controlling and that the only authority directly on point, *Jenkins XIV*, provides a compelling rationale consistent with recent Supreme Court precedent since *Oliver*. Accordingly, I am satisfied that the burden of proof remains on defendants to demonstrate that past disparities found in the original remedial order have been eliminated to the extent practicable.

### III.

For the foregoing reasons, defendants' motion in limine regarding the burden of

proof (dkt # 1553) is **DENIED.** Plaintiffs' motion in limine (dkt # 1556) is **GRANTED.**

### *ORDER*

In accordance with the opinion filed this date,

**IT IS ORDERED** that defendants' motion in limine regarding the burden of proof (dkt # 1553) is **DENIED.** Plaintiffs' motion in limine (dkt # 1556) is **GRANTED.**